Argued and submitted August 12, 2010, affirmed October 12, 2011, petition for review allowed May 17, 2012 (352 Or 33)

Billie Charles TOWE,
*Plaintiff-Appellant,*

*v.*

SACAGAWEA, INC.,
dba Re/Max Equity Group, Inc.;
Re/Max International, Inc.,
and Rick J. Matthews,
*Defendants,*

*and*

Rick J. MATTHEWS
and Sherry Matthews,
dba Mountain View Rock;
and Re/Max Ideal Properties, Inc.,
*Defendants-Respondents.*

Jackson County Circuit Court
084951L2; A142775

264 P3d 184

J. Randolph Pickett argued the cause for appellant. With him on the briefs were R. Brendan Dummigan, Kristen West, and Pickett Dummigan LLP.

Andrew Grade argued the cause for respondents Rick J. Matthews and Sherry Matthews. With him on the brief was Fotouhi Epps Hillger Gilroy PC.

David O. Wilson argued the cause and filed the brief for respondent Re/Max Ideal Properties, Inc.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Landau, Judge pro tempore.

ORTEGA, P. J.

Sercombe, J., dissenting.

## ORTEGA, P. J.

Plaintiff in this negligence case appeals after the trial court granted summary judgment in favor of defendants Rick Matthews and Sherry Matthews, dba Mountain View Rock (Mountain View), and Re/Max Ideal Properties (Re/Max). Plaintiff brought an action to recover for injuries he suffered after hitting a cable stretched across a private road (the access road) while riding his motorcycle. Plaintiff now challenges the trial court's conclusion that, as a matter of law, plaintiff was 100 percent responsible for his injuries. We affirm the trial court's award of summary judgment to both defendants, but on alternative grounds that were also presented below—namely, that (1) as a matter of law, plaintiff was a trespasser and Mountain View's conduct met the standard of care applicable to trespassers, and (2) Re/Max cannot be liable for plaintiff's injuries because its conduct was not the cause of those injuries as a matter of law.

When reviewing a trial court's grant of summary judgment, we view the facts and all reasonable inferences that may be drawn from them in the light most favorable to the nonmoving party—in this case, plaintiff. *Vaughn v. First Transit, Inc.*, 346 Or 128, 132, 206 P3d 181 (2009).

On a Sunday in November 2006, plaintiff and his girlfriend's son, Jerid, were out riding their motorcycles together on Indian Creek Road near plaintiff's home. Just after 4:00 p.m., while it was still daylight, the two turned off of Indian Creek Road and onto the access road. That road was partly graveled, but was paved on Mountain View's property, which began about half a mile off of Indian Creek Road. At the beginning of the access road, where it connected with Indian Creek Road, a large sign was posted, listing information for Mountain View and another landowner on the access road and indicating, in red lettering, "Private Road No Trespassing." Although plaintiff saw the sign and knew the access road to be private, he nevertheless proceeded up the road on his motorcycle. Mountain View's property contains a quarry and is the last property on the access road, past two other properties.

Approximately two years earlier, because of theft and vandalism at the quarry, Mountain View installed a

cable—suspended about three feet high between two posts—to block the access road at the entrance to Mountain View's property. Plaintiff, who had worked for Mountain View in December 2005 and January 2006, was aware that the first person to the quarry in the morning would open the cable using a key that was hidden under a rock nearby, and the last person to leave at the end of the work day would close the cable. In fact, plaintiff himself had opened or closed the cable at least twice during his employment there.

On the day in question, in addition to the "No Trespassing" sign, a Re/Max sign was posted at the intersection of Indian Creek Road and the access road. The sign contained a directional arrow pointing up the access road and had been placed in that location 10 months earlier by a Re/Max agent with whom one of the properties on the access road—"the Kinyon property"—had been listed for sale. The real estate agent also had placed a larger Re/Max sign on the Kinyon property itself, approximately 120 yards from the location where the cable stretched across the access road. When he initially toured the Kinyon property with the owner, the listing agent noticed the cable across the access road on Mountain View's land. He also saw it on later occasions when he visited the property. In spring of that year, plaintiff had driven up the access road with his girlfriend to look at the Kinyon property, which was still listed for sale with Re/Max at that time. Later, in the summer of that year, the listing was withdrawn and, as a result, the real estate agent removed the Re/Max sign from the Kinyon property. He failed, however, to remove the directional sign from the base of the access road.

On the weekend in question, as well as the previous weekend, plaintiff's girlfriend had told him that there were several properties for sale on the access road in addition to the Kinyon property that they had looked at in the spring. Plaintiff understood from those discussions that the properties must be on Mountain View's "private road somewhere[.]" Plaintiff's girlfriend had indicated that the additional properties would not sell because Mountain View would not "allow [an] easement on the road," and plaintiff thought that, because Mountain View had paved its part of the access road, it would not be willing "to allow anybody" on its road.

Before following Jerid up the access road, plaintiff saw the Re/Max directional sign. He thought that he would look for the additional properties for sale up the access road. On the way up the road, plaintiff looked around for a sign to locate property for sale. There was no longer a sign on the Kinyon property and plaintiff did not see any other sign identifying property on the road that was for sale. He had never seen a Re/Max sign on Mountain View's property.

On that day, several ribbons of yellow caution tape as well as an orange cone hung from the cable. In addition, immediately after the accident at issue, an orange sign reading "POSTED No Trespassing" was found face up on the ground in the road near the cable.[1] Although plaintiff previously had known about the cable, on that particular day he forgot about its possible presence across the access road.

Jerid saw the cable across the road and stopped his motorcycle about 100 yards away from it. Although he saw Jerid stop, plaintiff continued up the access road and accelerated slightly while passing Jerid. Plaintiff then turned and looked back at Jerid for about half a second—long enough to see that Jerid had a "shocked" look on his face—before looking back at the road ahead. At that point, while driving between 25 and 30 miles per hour, plaintiff saw the cable, which was then less than 25 yards away. Although he attempted to stop, he was unable to do so in time, and hit the cable. Plaintiff acknowledged that, before looking back at Jerid, he had not been focused straight ahead, but instead had been glancing from one side of the road to the other looking for property for sale. As a result of the accident, plaintiff suffered serious injuries.

Plaintiff sought damages from defendants, contending that his injuries were the result of their negligence. Specifically, plaintiff alleged that Mountain View was negligent in placing the cable across the access road, failing to better mark the cable, failing to warn travelers of the cable's presence, and failing to adequately inspect the access road. Plaintiff's complaint also alleged that Mountain View was

---

[1] We describe the markings on the cable based on photographs taken by police responding to the accident. In his brief, plaintiff also references those photographs in describing the cable.

negligent *per se* and that its actions constituted wanton mis-
conduct. Plaintiff alleged that Re/Max was negligent in plac-
ing the directional sign on Indian Creek Road, failing to
remove the directional sign after the "larger 'For Sale' sign
had been removed," failing to warn travelers of the cable, and
failing to adequately inspect the access road. Both Mountain
View and Re/Max moved for summary judgment.

After hearing argument by all of the parties, the trial
court issued an order recounting what it considered to be the
dispositive facts:

"(1)   [Plaintiff and Jerid] were riding their motorcycles
on a private road during daylight when they approached a
cable across the road.

"(2)   [Jerid] saw something 'hanging across' the road,
'started slowing down,' and knew it was a cable.

"(3)   [Plaintiff and Jerid's] version of the events preced-
ing the time when [plaintiff] hit the cable are identical in all
material respects. According to [Jerid], [plaintiff] 'kind of
coasted and then turned around and looked . . . back at me
and then he looked forward again . . . [a]nd then he hit the
cable.' According to [plaintiff, Jerid] 'stopped but I . . . con-
tinued to go. And I started to accelerate [a] little bit, and I
looked back, and he had a shocked look on his face, and I
turned back around, cable.' [Plaintiff] testified that because
of the shocked look on [Jerid's] face, [Jerid] 'could see that I
was going to run into' the cable.

"(4)   Although [plaintiff] only turned around once to
look at [Jerid], when asked if he was looking forward down
the road at all other times, he testified, 'actually my eyes
are wandering, looking for a sign' indicating where a piece
of property was for sale."

(Citations omitted.) Based on those facts, the trial court con-
cluded that, as a matter of law, defendants could not be liable
for plaintiff's injuries. Noting that the law requires a person
driving a motor vehicle to keep a lookout at all times, the
court concluded that defendants could not "be found negli-
gent in not foreseeing that [plaintiff] would disobey the law
requiring motorists to keep a lookout by taking his eyes off
the road to turn around." In the court's view, plaintiff was

"driving without looking" and was, therefore, "100% responsible for his injuries and no reasonable juror could find otherwise." In other words, the trial court concluded that plaintiff's conduct alone was the cause of plaintiff's harm. Accordingly, it granted summary judgment in favor of defendants.

On appeal, we review the trial court's summary judgment ruling to determine whether we agree that "there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law." ORCP 47 C; *O'Dee v. Tri-County Metropolitan Trans. Dist.*, 212 Or App 456, 460, 157 P3d 1272 (2007). There is no genuine issue of material fact if, "based on the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment." ORCP 47 C. Because, at trial, plaintiff would have the burden of producing evidence that defendants acted negligently, on summary judgment plaintiff must "come forward with specific facts demonstrating a genuine issue for trial." *O'Dee*, 212 Or App at 461; *see* ORCP 47 C ("The adverse party has the burden of producing evidence on any issue raised in the motion as to which the adverse party would have the burden of persuasion at trial.").

In view of the trial court's conclusion that he was 100 percent responsible for his own injuries, plaintiff contends that "comparative fault is an issue to be decided by a jury" and that, "[f]or purposes of summary judgment, [he] presented sufficient evidence such that a jury could decide that the combined fault of [Re/Max and Mountain View] is greater than that of * * * plaintiff." Defendants, in turn, contend that the judgment in their favor should be affirmed because, as a matter of law, plaintiff's negligence exceeded any negligence on their part.

In addition, both defendants raise alternative bases on which they contend we should affirm the trial court's decision. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659, 20 P3d 180 (2001) (the right for the wrong reason principle permits a reviewing court to affirm a lower court's ruling under appropriate circumstances). As defendants' proffered alternative bases for affirmance were raised

in the summary judgment proceedings before the trial court, it is appropriate to consider them in this case. *See id.* at 659-60 (for an appellate court to affirm on an alternate basis (1) the facts of record must be sufficient to support the alternate basis; (2) the trial court's ruling must be consistent with the view of the evidence under the alterative basis; and (3) the record must materially be the same one that would have been otherwise developed). According to Mountain View, its conduct "met the standard of reasonable conduct deemed to have [been] set by the community" and, whether plaintiff is viewed as a trespasser or a licensee, Mountain View met the applicable standard of care. Re/Max, for its part, asserts that the facts on summary judgment fail to establish duty, foreseeability, and causation and that, therefore, the trial court's ruling should be affirmed. Because they are dispositive, we address only (1) Mountain View's contention that summary judgment was proper because plaintiff was a trespasser as a matter of law and Mountain View's conduct met the standard of care applicable to trespassers; and (2) Re/Max's assertion that it cannot be held liable for plaintiff's injuries because its conduct was not the cause of the harm.

As a general matter, in order to prevail on a claim for negligence, a plaintiff must demonstrate

> "(1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiff's harm, and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent."

*Solberg v. Johnson,* 306 Or 484, 490-91, 760 P2d 867 (1988). The role of the court, as "it ordinarily is in cases involving the evaluation of particular situations under broad and imprecise standards[,]" is "to determine whether upon the facts alleged or the evidence presented no reasonable factfinder could decide one or more elements of liability for one or the other party." *Fazzolari v. Portland School Dist. No. 1J,* 303 Or 1, 17, 734 P2d 1326 (1987).

We begin by evaluating Mountain View's potential liability. As noted, Mountain View asserts that the trial court's judgment should be affirmed because plaintiff was, as a matter of law, a trespasser on its property. Plaintiff responds that there are genuine issues of fact regarding whether he was a trespasser. Furthermore, according to plaintiff, even if he was a trespasser, there are genuine issues of material fact regarding whether Mountain View's conduct met the standard of care owed to trespassers.

"Oregon follows the traditional rules governing landowner liability, under which the duty that a landowner owes to a person who comes on land depends on whether the person is an invitee, licensee, or trespasser." *Stewart v. Kralman*, 240 Or App 510, 517, 248 P3d 6 (2011). A possessor of land has the duty to warn an invitee of latent dangers and to " 'protect the invitee against dangers in the condition of the premises about which the [possessor] knows or reasonably should have known.' " *Johnson v. Short*, 213 Or App 255, 260, 160 P3d 1004 (2007) (quoting *Cassidy v. Bonham*, 196 Or App 481, 486, 102 P3d 748 (2004) (brackets in *Johnson*)). With respect to a licensee, a possessor of land may be liable for injury resulting from a condition on the land only if

"(a)  the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or realize the danger, and

"(b)  he fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved, and

"(c)  the licensees do not know or have reason to know of the condition and the risk involved."

*Johnson*, 213 Or App at 260 (internal quotation marks omitted). On the other hand, it is well settled that the possessor of premises owes no duty to a trespasser other than to avoid injuring him by willful or wanton conduct. *Stewart*, 240 Or App at 517; *see, e.g., Monnet v. Ullman et al.*, 129 Or 44, 55, 276 P 244 (1929).

An invitee is " 'one who comes upon the premises upon business which concerns the occupier, with the occupier's invitation, express or implied.' " *Denton v. L. W. Vail Co.*, 23 Or App 28, 32, 541 P2d 511 (1975) (quoting *Rich v. Tite-Knot Pine Mill*, 245 Or 185, 191-92, 421 P2d 370 (1966)). Unlike an invitee, a licensee is one who " 'with the [possessor's] permission, comes upon premises for the licensee's own purposes, often social.' " *Johnson*, 213 Or App at 260 (quoting *Nelsen v. Nelsen*, 174 Or App 252, 256, 23 P3d 424 (2001) (brackets in *Johnson*)). Finally, a trespasser " 'is one who enters or remains on premises in the possession of another without a privilege to do so, created by the possessor's consent or otherwise.' " *Denton*, 23 Or App at 32 (quoting *Rich*, 245 Or at 191).

The record here contains no evidence that plaintiff entered Mountain View's private road in connection with business he had with Mountain View, so he would not be an invitee under the usual criteria. *See Denton*, 23 Or App at 32 (concluding that a motorist who was "not on the roadbed in connection with any purpose of the defendants * * * was not an invitee"). Nevertheless, a person may also be considered an invitee when "the occupier, expressly or impliedly, leads the person to believe that it intended visitors to use the premises for the purpose that the person is pursuing and that the use was in accordance with the intention or design for which the premises were adapted or prepared." *Walsh v. C & K Market, Inc.*, 171 Or App 536, 539, 16 P3d 1179 (2000). Moreover, the possessor of a private road may be considered to have tacitly invited people to use the road when the possessor maintains that road in such a manner that " 'he knows or should know that others will reasonably believe it to be a public highway[.]' " *Wolfe v. Union Pacific R. Co.*, 230 Or 119, 124, 368 P2d 622 (1962) (quoting *Restatement of Torts* § 367 (1934)). Under those circumstances, the possessor of the private road can be subject to liability for bodily harm caused " 'by his failure to exercise reasonable care to maintain it in a reasonably safe condition for travel.' " *Id.* (quoting *Restatement* § 367).

In *Wolfe*, the court considered whether the plaintiff had presented a jury question regarding whether the defendant, the owner of a private road on which the plaintiff was

injured, had issued "a tacit invitation to use the roadway as a part of the public highway[.]" 230 Or at 125. In that case, believing that it would take him onto the freeway, the plaintiff turned off of Halsey Street in Portland onto the defendant's private road and was injured when he ran his car off a steep embankment at a sharp curve in the road. The defendant had placed a sign on its property east of the private road that read "No Trespassing Private Property Union Pacific Railroad[.]" *Id.* at 121 (internal quotation marks omitted). The court reasoned that there was evidence from which the jury "could have found that the position of the 'Private Property' sign would have led a reasonable man to believe that it was intended to designate only the private character of the * * * field adjoining the roadway and not the roadway itself." *Id.* at 125. Thus, it concluded that the jury could reasonably have concluded that plaintiff, exercising reasonable judgment, "could have regarded the roadway as an integral part of the public highway system."

Here, by contrast, there is no evidence that Mountain View engaged in any conduct that could be considered a tacit invitation to use the access road. At the entry point of the road, a sign read, in part, "Private Road No Trespassing." Unlike the sign in *Wolfe*, the sign in this case clearly stated that the road itself (as opposed to the land beside the road) was private and not open to the public. Plaintiff saw the sign before turning onto the access road. Furthermore, plaintiff, in his deposition testimony, indicated that he personally was aware that Mountain View's road was private and that Mountain View did not want people using its road. Although Mountain View's section of the access road was paved, in contrast to the gravel section of the access road adjoining Indian Creek Road, that type of improvement would not reasonably lead others to believe that the clearly marked private road was part of a public highway. Furthermore, the real estate directional sign at the base of the road was not placed there by Mountain View or its agent, and did not relate to any land of Mountain View's. Overall, Mountain View did nothing that would reasonably lead plaintiff to believe that Mountain View's private road was part of the public highway system. Its sign at the base of the road clearly stated the opposite: that the road was private and that

motorists were not to trespass on it—and indeed, plaintiff was in fact aware that the road was not part of the public highway system. Thus, on this record, no reasonable juror could conclude that Mountain View had tacitly invited people to use the road.

Turning to the distinction between a licensee and a trespasser, in *Denton* this court examined which of the two categories fit a motorcyclist riding on a road that was not open to the public. In that case, the plaintiff was injured "when he rode his motorcycle into a barbed wire fence stretched across a new section of highway that was under construction and had never been open to the public." 23 Or App at 30. The new roadway had a smooth surface in some areas and in others "was impassable because of piles of boulders." *Id*. Before this court, the issue was whether the defendants "owed a duty to plaintiff not to put up a fence or to post some kind of warning that the fence was there," *id*. at 31, and, to resolve that issue, the critical question was whether the "plaintiff was a licensee or a trespasser," *id*. at 32.

The court explained that "a trespasser and a licensee enter the land for their own purposes; the distinction is whether or not there is consent of the occupier." *Id*.

" 'The word "consent" or "permission," indicates that the possessor is in fact willing that the other shall enter or remain on the land, or that his conduct is such as to give the other reason to believe that he is willing that he shall enter, if he desires to do so. A mere failure to object to another's entry may be a sufficient indication or manifestation of consent, if the possessor knows of the other's intention to enter, and has reason to believe that his objection is likely to be effective in preventing the other from coming. On the other hand, the fact that the possessor knows of the intention to enter and does not prevent it is not necessarily a manifestation of consent, and therefore is not necessarily permission. A failure to take burdensome and expensive precautions against intrusion manifests only an unwillingness to go to the trouble and expense of preventing others from trespassing on the land, and indicates only toleration of the practically unavoidable, rather than consent to the entry as licensee. Even a failure to post a notice warning the public not to trespass cannot reasonably be construed as an

expression of consent to the intrusion of persons who habitually and notoriously disregard such notices.' "

*Id.* at 33 (quoting *Restatement (Second) of Torts* § 300 comment c (1965)). The court concluded that the plaintiff in that case was a trespasser on the roadway as a matter of law because the condition of the roadway made clear that the road was not open for use:

"Where objecting will probably do no good or people habitually disregard notices, or where it is burdensome or expensive to keep people out of the area, consent will not be implied [even from knowledge that people use the land in question]. * * * It was very clear that the new roadway was not yet open for public use, not the least from the fact that it could not be driven from one end to the other, even by a motorcycle."

*Id.* at 34-35.

As support for his argument that there are issues of fact regarding whether he was a trespasser on the access road, plaintiff here points to the fact that, unlike the road in *Denton*, "the access road was clear and open for use[.]" However, the fact that the road was passable and, on Mountain View's property, paved does not somehow create an issue regarding whether Mountain View consented to plaintiff's use of the road. To create such an issue, plaintiff would need to produce evidence of conduct by Mountain View that could reasonably be understood as expressing consent to plaintiff's intrusion on the access road. Plaintiff has not done so. On the contrary, the sign at the entrance of the road expressed exactly the opposite intention. Plaintiff saw the sign and was aware that Mountain View did not want people driving on its road. Moreover, the real estate sign at the base of the access road had no connection to Mountain View, and the condition of which plaintiff complains—the cable blocking the access road at the entrance of Mountain View's property—was itself an attempt to prevent others from using Mountain View's road. Given all these facts, plaintiff was a trespasser on the access road as a matter of law.

Plaintiff also contends that there are questions of fact as to whether he should be considered a "persistent intruder," imposing a higher duty on Mountain View. For a

person to be considered a "constant trespasser" or, to use plaintiff's term, "persistent intruder," a possessor of land must know, or from facts within his knowledge have reason to know, that trespassers constantly intrude on a limited area of his land. *Stewart*, 240 Or App at 518 n 4; *Denton*, 23 Or App at 36. "It is not enough that he know or have reason to know that persons persistently roam at large over his land." *Id.* (internal quotation marks omitted). Rather, the possessor must be aware of constant and persistent intruders on his land in the area where the allegedly dangerous condition is located. *See id.*

Mountain View installed the cable in an attempt to prevent access to the quarry after incidents of theft and vandalism there. According to plaintiff, that evidence supports the view that Mountain View knew or should have known that trespassers constantly intruded on its land. However, "persistent intruder" liability requires evidence related to the limited area in question. Here, there is no evidence that Mountain View was or should have been aware of constant and persistent intruders into the limited area at the entrance to its property after installation of the cable. The evidence of incidents of theft and vandalism at the quarry before installation of the cable in 2004 is not sufficient to create a genuine issue of fact as to whether, at the time of the accident in November 2006, Mountain View should have been aware that trespassers constantly and persistently intruded onto its private road.

In light of the foregoing conclusions, Mountain View was required only to avoid willful and wanton conduct that might cause injury to plaintiff. Put another way,

" 'a possessor of land is not liable to trespassers for physical harm caused by his failure to exercise reasonable care

" '(a)  to put the land in a condition reasonably safe for their reception, or

" '(b)  to carry on his activities so as not to endanger them.' "

*Denton*, 23 Or App at 35 (quoting *Restatement (Second)* § 333). The willful and wanton conduct that must be avoided is "a willful determination not to perform a known duty."

*Monnet*, 129 Or at 55 (internal quotation marks omitted). In other words, the act which produced the injury to a trespasser, in order to support liability for that injury, "must have been intentional, or must have been done under such circumstances as evinced a reckless disregard for the safety of others, and a willingness to inflict the injury complained of[.]" *Id.* at 56 (internal quotation marks omitted).

The record here contains no facts from which a reasonable jury could conclude that Mountain View acted willfully and wantonly. Mountain View placed a cable across its private road to prevent trespassers from accessing its property. As noted, it posted a sign at the entrance of the access road indicating that the road was private and that trespassing was forbidden. The cable, further along the road at the entrance to Mountain View's property, stretched across the road between two posts and was marked by ribbons of caution tape and an orange cone. There simply is no evidence that Mountain View acted with a reckless disregard for the safety of others and a willingness to inflict injury upon them when it placed the cable across its road. Accordingly, Mountain View is entitled to summary judgment in its favor.

We next turn to Re/Max, which asserts, in part, that we should affirm the summary judgment in its favor because, as a matter of law, plaintiff cannot establish causation. In other words, it is Re/Max's position that its conduct in leaving its directional sign at the base of the access road, but removing its sign from the Kinyon property after the listing was withdrawn, did not cause plaintiff's injuries.

Our case law varies in its descriptions of causation. However, in any negligence case, the plaintiff has the burden to present evidence that the defendant caused the harm at issue. *See Joshi v. Providence Health System*, 342 Or 152, 161-62, 149 P3d 1164 (2006). There are two tests of causation that are potentially applicable: the "but for" test and the "substantial factor" test. *Id.* at 162. Under the "but for" test for causation, "[t]he defendant's conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it." *Id.* at 161

(internal quotation marks omitted). In other words, the "plaintiff must demonstrate that the defendant's negligence more likely than not caused the plaintiff's harm[.]" *Id.* at 162. Under the "substantial factor" test, "[a] party is liable in negligence only if its conduct was a substantial factor in causing the plaintiff's injury." *Lyons v. Walsh & Sons Trucking Co., Ltd.*, 183 Or App 76, 83, 51 P3d 625 (2002), *aff'd*, 337 Or 319, 96 P3d 1215 (2004) (internal quotation marks omitted). Although the term "substantial factor" is somewhat amorphous, *id.*, it refers to an important or material factor, and not one that is insignificant, *id.* at 83 n 5. The term "substantial" denotes " 'the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable [persons] to regard it as a cause, using the word in the popular sense, in which there always lurks the idea of responsibility[.]' " *Furrer v. Talent Irrigation District*, 258 Or 494, 511, 466 P2d 605 (1969) (quoting *Restatement (Second)* § 431 comment a); *see also Lasley v. Combined Transport, Inc.*, 351 Or 1, 7, 261 P3d 1215 (2011) (discussing "substantial factor" test of causation). Here, under either test, no reasonable juror could conclude from the facts on summary judgment that Re/Max's conduct caused plaintiff's injuries.

Again, the conduct that Re/Max is alleged to have engaged in is placing a directional sign pointing to the access road, failing to remove that sign when it removed the "for sale" sign from the Kinyon property, and failing to warn plaintiff of the cable. Plaintiff in this case saw the Re/Max directional sign when he turned to go up the access road. He and his girlfriend had been up the access road before to look at the Kinyon property when it was listed for sale. However, plaintiff testified that his girlfriend had informed him on the weekend of the accident as well as the weekend before that there were "more" properties for sale up that road, and that he understood from those conversations that those properties were on Mountain View's private road. When he rode up the access road, plaintiff intended to locate the additional properties that his girlfriend had told him were for sale. Although plaintiff had worked at Mountain View's quarry several months earlier, and had opened and closed the cable at least twice, he "forgot" about the cable on the day of the accident.

When Jerid stopped his motorcycle upon seeing the cable, plaintiff turned around to look at Jerid, rather than keeping his eyes on the road.

Taken together, those facts are not legally sufficient to support the conclusion that Re/Max's conduct caused plaintiff to collide with the cable across the access road and to sustain injuries. Plaintiff did not go up the road to look at the Kinyon property; rather, he testified that he went up the road to look for property that his girlfriend told him was for sale and that he believed to be on Mountain View's road, which he knew to be private. There is no indication from this record that the presence of the Re/Max sign substantially influenced his decision to travel up the access road or that, in the absence of Re/Max's conduct, the accident would not have occurred. Moreover, despite his personal knowledge of the cable, plaintiff "didn't think" about it and was looking backwards as he approached it. Under those circumstances, plaintiff cannot establish causation as to Re/Max as a matter of law and, accordingly, Re/Max is entitled to summary judgment.

Affirmed.

**SERCOMBE, J.,** dissenting.

I dissent because I draw different factual inferences from the summary judgment record than those stated by the majority. If the record is viewed in the light most favorable to plaintiff, as is required, there are jury questions on defendants' liability to plaintiff in tort. Specifically, the record allows the inferences that the graveled road leading to the cabled entrance to defendant Mountain View's property was a road open to and used by the public; that the "private road" posting referred to the paved Mountain View road leading to the quarry; that Mountain View was aware of the public use of the graveled road; that Mountain View knew that the cable gate was in disrepair and was insufficient to provide adequate warning of its blockage of the road entrance; and that Mountain View knew of the disrepair of the cable gate and intentionally or recklessly failed to remedy its condition.

If those facts are true, then Mountain View failed to take reasonable actions to avoid a foreseeable risk to public

users of the graveled road, including plaintiff, and that failure to act caused plaintiff's injuries. Even if the graveled road was private and owned by Mountain View and plaintiff was a trespasser on that road, Mountain View owed plaintiff a duty to not act wantonly. Issues of fact exist on whether Mountain View acted in that manner. Thus, I disagree with the majority's conclusion that summary judgment in favor of Mountain View was proper.

As to defendant Re/Max, a reasonable juror could conclude that plaintiff was induced by its sign on Indian Creek Road to drive up the graveled road in search of homesites marketed by Re/Max. With that inducement, Re/Max's conduct was a cause of plaintiff's encounter with the cable gate. Given Re/Max's knowledge of the dangerousness of the cable gate, a jury question existed on whether the harm to plaintiff was foreseeable and whether Re/Max failed to exercise reasonable care by not warning travelers about the cable gate or diverting them from that danger. I dissent from the majority's conclusion that summary judgment in favor of Re/Max was appropriate.

The devil is in the details. And so, I necessarily begin with a restatement of the facts.

## I.   HISTORICAL FACTS

In reviewing a grant of summary judgment, we view the record and all reasonable inferences that may be drawn from it in the light most favorable to the nonmoving party, here plaintiff, to determine whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. No genuine issue of material fact exists if no objectively reasonable juror could return a verdict for the nonmoving party. ORCP 47 C.[1] I state the relevant facts in accordance with that standard.

---

[1] ORCP 47 C, which governs motions for summary judgment, provides, in relevant part:

"The court shall grant the motion if the pleadings, depositions, affidavits, declarations and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law. No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment. The adverse party has the burden of producing evidence on any issue raised in the motion as to which the

On the afternoon of Sunday, November 5, 2006, plaintiff and a companion, Jerid, went on a motorcycle ride together. Nearing the end of their ride, they were returning home on Indian Creek Road, a public road located near plaintiff's residence. During their ride, plaintiff and Jerid saw a Re/Max sign posted at the intersection of Indian Creek Road and an uphill access road; at that point, Indian Creek Road consisted of gravel. The sign contained the Re/Max logo and a directional arrow pointing up the access road. In addition, plaintiff was aware of a second sign that was posted at the intersection. That second sign read, from top to bottom, "Mountain View Rock," followed by two phone numbers; "Jerry & Karen Clarke," followed by an Indian Creek Road address; and "Private Road No Trespassing."

Plaintiff and Jerid decided to detour from their destination and drive up the access road. The access road led past two properties—the Clarke property and the Kinyon property—before entering onto and ending at the quarry property owned by Mountain View. The first part of the access road was graveled (the "graveled road") and provided access to the Clarke and Kinyon properties and beyond. Part of the graveled road, to some unspecified point before Mountain View's property, was owned by the Bureau of Land Management (BLM). Defendant Rick Matthews testified that he did not know who owned the road beyond the BLM ownership. The Clarke property, which included a residence, was located near the beginning of the graveled road. Sometime in 2005, Jerry Clarke and defendant Rick Matthews installed a gate to block access to the Clarkes' property. However, because BLM would not let the gate be closed, it was never used.

The Kinyon property was beyond the Clarke property on the graveled road. The property did not have a residence and was fairly wooded. It consisted of three contiguous parcels of land that were five acres each; only the first parcel fronted the access road. Near the midpoint of the property's

---

adverse party would have the burden of persuasion at trial. The adverse party may satisfy the burden of producing evidence with an affidavit or a declaration under section E of this rule."

frontage on the access road, a dirt road led from the graveled road into the interior of the property.

Finally, Mountain View's property was situated beyond the Kinyon property on both sides of the access road. At the "beginning" of Mountain View's property, *i.e.*, on the boundary line with the Kinyon property, a cable was stretched across the access road between two steel posts that were set in concrete; at that location, the road turned from gravel to pavement (the paved road).[2]

The cable served as a gate to limit access to the quarry and had been installed by Mountain View in approximately 2004 to prevent theft and vandalism. Mountain View employees regularly inspected, opened, and closed the cable gate on days that the quarry was in operation. During those times when the cable was up, it was no more than three feet off the ground.

On November 5, 2006, however, the cable hung low, about 10 to 12 inches off the ground. The steel posts and the cable were weathered and rusted. Three pieces of tattered yellow caution tape were tied to the cable, and threaded onto the cable, off to one side, was a dirty and faded orange construction cone; disconnected from the cable, resting face-up in the road, was an orange sign that read, "Posted: No Trespassing."[3]

In January 2006, the owner of the Kinyon property engaged Re/Max to sell the three lots. The Re/Max listing

---

[2] Evidence in the record—including two demonstrative maps, one hand-drawn by plaintiff and one hand-drawn by Croslow, the Re/Max listing agent—indicate that the cable was located either just in front of or just beyond the Kinyon property line. Viewing all the evidence in the record in the light most favorable to plaintiff, I infer that the cable was located on the border of Mountain View's property, approximately 120 yards from where the separate Re/Max sign had been posted next to the dirt road on the Kinyon property.

[3] To the extent that plaintiff presented evidence below that the cable was marked in a different or lesser manner on November 5, 2006, I understand plaintiff on appeal to have abandoned his contentions in that regard. I describe the markings on the cable in much the same manner as did plaintiff in setting forth his summary of material facts in his opening brief. *See* ORAP 5.40(9) (the appellant's opening brief shall set forth "[a] concise summary, without argument, of all the facts of the case material to determination of the appeal"). Plaintiff based his description of the cable on certain police photographs that were taken the day of the accident; I do the same.

agent, Croslow, initially saw the cable stretched across the access road when he first toured the Kinyon property with the owner, just prior to or during January 2006. Croslow also saw the cable on several other subsequent occasions when he visited the property or showed the property to interested buyers. Right after listing the property in January 2006, Croslow posted two signs advertising the sale of the property: a directional sign at the beginning of the access road and a separate sign with his contact information on the property itself at the intersection of the graveled road and the property's interior dirt road.

Regarding that separate sign, a declaration submitted by Re/Max in support of its motion for summary judgment indicates that "[t]here was a separate sign on the property itself which was about 120-150 yards before the cable." Croslow estimated that he removed the signs in early September 2006. However, around November 2006, defendant Rick Matthews recalled seeing, on the access road, a Re/Max sign advertising the sale of property; he also may have seen a Re/Max directional sign at the beginning of the access road.

In March or April 2006, plaintiff and his girlfriend drove up the access road and looked at the Kinyon property. That visit occurred on a Sunday, and, at that time, both the Re/Max signs were posted and the cable was down. The weekend of November 5, 2006, as well as the weekend before, plaintiff was told by his girlfriend that there were three or four "more" properties for sale on the access road, but that they would not sell because defendant Rick Matthews would not allow an easement on the paved road. Plaintiff believed that those properties must have been on the paved section of the access road, where the cable was—an area that he also described as defendant Rick Matthews's "private road."

The fateful motorcycle ride was Jerid's idea. Because Jerid's motorcycle was having mechanical problems, plaintiff followed him to "make sure he didn't have any problems." Plaintiff further testified, "[a]nd then the Re/Max sign is down here at the bottom of the road; I said, well, might as well go up there and see where there's properties for sale. I'm thinking it's in the vicinity of the same place, but I wasn't

sure." Plaintiff testified he understood from his girlfriend that defendant Matthews owned the properties being sold by Re/Max. After looking at the Re/Max directional sign, plaintiff pointed up the access road. Plaintiff and Jerid then turned onto the graveled road, and, at some point, Jerid took the lead in riding up the graveled road. As Jerid neared Mountain View's property, he saw the two steel posts and something hanging low between them. Jerid slowed his motorcycle down and, as he got closer, identified the hanging object as a cable. Jerid ultimately came to a stop short of the cable.

Plaintiff, on the other hand, collided with the cable. After Jerid began to slow down his motorcycle, plaintiff also began to slow down and almost came to a stop. Failing to do so, however, plaintiff started to accelerate and passed Jerid. The reason plaintiff went up the road was to locate the "more" properties that were for sale. At the time, the separate Re/Max sign at the Kinyon property was down, and plaintiff thought, but was not sure, that the additional properties were in the same vicinity.

After he passed Jerid, plaintiff's eyes wandered, by glancing back and forth, as he looked for a second Re/Max sign that would locate the additional properties that were for sale. Plaintiff also glanced back at Jerid to see if Jerid was following him. Plaintiff instead saw Jerid sitting on his motorcycle with a shocked look on his face. Plaintiff estimated he was about 100 yards short of the cable when he saw that Jerid was stopped and about 75 or 50 yards short of the cable when he saw Jerid's expression. When plaintiff turned back around, to face forward, plaintiff finally saw the cable, but he did not have time to stop before hitting it; at the time he finally saw the cable, plaintiff estimated he was probably less than 25 yards from it. At the time of the collision, plaintiff was traveling uphill along the graveled road. Plaintiff noted that, after he hit the cable, it "slingshotted me back down the hill, and I flew through the air."

As a result of his collision with the cable, plaintiff was thrown from his motorcycle and sustained multiple injuries, the seriousness of which was undisputed by the parties in the summary judgment proceedings. As alleged in the

complaint, plaintiff suffered from a variety of fractures, ruptures, dislocations, tears, and lacerations, in addition to other bodily injuries. In total, plaintiff underwent 10 surgical procedures as a result of his injuries. He ultimately filed this negligence action against defendants.

For purposes of analyzing defendants' potential liability to plaintiff, the foregoing facts suggest that (1) the graveled road was owned in part by the BLM and was open to the public, providing legal access to the Clarke residence and to the Kinyon lots; (2) the graveled road was used by members of the public at least for access to the Clarke and Kinyon properties as well as by customers and employees of the quarry; (3) the purpose of the cable gate was to prevent travelers on the graveled road from entering Mountain View's property; (4) the "private" portion of the access road was on the Mountain View property and was distinguished from the graveled road by the cable gate barrier, the once-posted signage (the downed "no trespassing" sign near the cable gate), and its paved surface; (5) the posted "private road" sign at the intersection of the access road and Indian Creek Road referred to the private paved road; (6) Mountain View's employees regularly opened and shut the cable gate and were aware of its condition and visibility; the rusted condition of the cable and the posts, the tattered caution tape, and the faded construction cone suggest that the dilapidation was longstanding; (7) the cable gate was a very dangerous condition, a condition capable of causing injuries as severe as those experienced by plaintiff; (8) Re/Max's agents were aware of the condition of the cable gate and its proximity to the property it marketed; and (9) plaintiff was induced to travel up the graveled road to look for properties marketed by Re/Max by the Re/Max sign invitation; plaintiff believed that those Re/Max properties were the properties mentioned by his girlfriend.

## II.   MOUNTAIN VIEW'S LIABILITY

The majority reasons that plaintiff was a trespasser on a private road owned by Mountain View when the accident occurred. From this premise, the majority concludes that Mountain View was obliged to avoid willful and wanton

conduct that might cause injury to plaintiff and that the "record here contains no facts from which a reasonable jury could conclude that Mountain View acted willfully and wantonly." 246 Or App at 40.

Both the premise and the conclusion are wrong. Plaintiff was on a road open to the public at the time he collided with the cable gate. The majority recognizes that Oregon law embraces a particular liability standard—that of reasonable care—when a landowner maintains part of his or her land in such a way that others reasonably will believe it to be a highway open to the public. 246 Or App at 35; *see Wolfe v. Union Pacific R. Co.*, 230 Or 119, 124-25, 368 P2d 622 (1962). In my view, the obligation of a landowner is no different when the publicly used road leads to or borders the land. We recognize that " '[a] landowner may be liable for harm to protected interests outside the land, caused by negligence on the land. *See Restatement (Second) of Torts* § 364 (1965).' " *John v. City of Gresham*, 214 Or App 305, 316, 165 P3d 1177 (2007), *rev dismissed as improvidently allowed*, 344 Or 581 (2008) (quoting *Hall v. Dotter*, 129 Or App 486, 490, 879 P2d 236 (1994)); *see also Taylor v. Olsen*, 282 Or 343, 348, 578 P2d 779 (1978) (obligation of property owner to use "reasonable care to prevent an unreasonable risk of harm" to adjacent road users from falling trees "is to be decided as a question of fact upon the circumstances of the individual case" (internal quotation marks omitted)). Mountain View should be held to a standard of reasonable care to avoid injury to persons who encounter dangerous conditions on the border of its property. There are issues of material fact on whether Mountain View complied with that standard of care that are sufficient to preclude summary judgment in its favor.

That same result obtains even if the graveled road was privately owned at the place of the accident and plaintiff was a trespasser on that road. The majority recognizes that a landowner may be liable to a "constant trespasser" if the landowner is "aware of constant and persistent intruders on his land in the area where the allegedly dangerous condition is located." 246 Or App at 39. The majority concludes, however, that "there is no evidence that Mountain View was or should have been aware of constant and persistent intruders

into the limited area at the entrance to its property after installation of the cable." *Id*. Again, I disagree. The length of the gravel road between Indian Hill Road and the cable gate was not long; plaintiff estimated it to be one-half mile. The cable gate was located at the border of the Mountain View property and the Kinyon properties. Mountain View was aware of public use of the graveled road to view the Kinyon properties that were for sale. Defendant Matthews testified he knew about the Re/Max signage. The "for sale" sign at the Kinyon property was posted for at least eight months and was taken down shortly before the accident. It was visible to Mountain View's employees traveling to and from their workplace. Jerid testified he had traveled up the graveled road between 10 and 15 times before the accident. There were issues of fact about whether the degree of the use of the graveled road by travelers prior to the accident was sufficient to classify plaintiff as one of many intruders into that area.

Finally, even if plaintiff was a trespasser to whom a limited duty was owed by Mountain View—a duty to not act in a willful or wanton manner—there are issues of material fact on whether Mountain View acted in a wanton manner. An injury is "wantonly" inflicted where it results from

"the doing of an intentional act of an unreasonable character in disregard of a risk known to the actor, or so obvious that he must be taken to have been aware of it and so great as to make it highly probable that harm would follow, usually accompanied by a conscious indifference to consequences."

*Cook v. Kinzua Pine Mills Co. et al*, 207 Or 34, 58-59, 293 P2d 717 (1956); *see also Falls v. Mortensen*, 207 Or 130, 138, 295 P2d 182 (1956), *overruled in part on other grounds by Lindner v. Ahlgren*, 257 Or 127, 133-34, 477 P2d 219 (1970) (" 'The elements necessary to characterize an injury as wantonly or wilfully inflicted are (1) knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another, (2) ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand, and (3) the omission to use such care and diligence to avert the threatened danger, when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another. * * *' 38 Am Jur 855, Negligence, § 178.").

In applying this same definition of wanton or willful conduct to analogous situations involving collisions between a motorcycle or all-terrain vehicle and a road cable, other courts have found wanton conduct where the defendant knew both that vehicles would be using the roadway and that the cable was unobvious enough to be dangerous. Thus, an Ohio appellate court concluded in *Seeholzer v. Kellstone, Inc.*, 80 Ohio App 3d 726, 731, 610 NE2d 594, 598 (1992):

> "Courts have invariably recognized that it is willful or wanton conduct on the part of a landowner or occupier to erect or maintain a wire or cable across a road or path where he knows or has reason to believe that trespassers ride their vehicles, where the wire or cable is not readily discernible, marked or otherwise warned against. [Citing cases from seven jurisdictions]."

Similarly, in *Antonace v. Ferri Contracting Co., Inc.*, 320 Pa Super 519, 526, 467 A2d 833, 837 (1983), involving a dirt bike rider who collided with a road cable, the court found the defendant landowner to be potentially liable because of wanton misconduct:

> "[I]t is clear that a jury could conclude that appellant knew that dirt bike riders such as the decedent were using the property, and that in view of this knowledge, erection or maintenance of a steel cable, in a position of limited visibility, without markings or warning signs, constituted, 'an act of unreasonable character, in disregard of a risk known to him or so obvious that he must have been aware of it, and so great as to make it highly probable that harm would follow.' Prosser, *Torts* § 33 at 151 (2nd ed 155) * * *."

In *Vickers v. Gifford-Hill & Co., Inc.*, 534 F2d 1311 (8th Cir 1976), the court upheld a jury verdict in favor of the personal representative of a motorcyclist who was fatally injured when he struck a cable stretched across the defendant's private road. Although the court found the decedent to be an implied invitee to whom a duty of reasonable care was owed by the defendant, it observed that

> "[t]he appellant's conduct could be characterized as wilful or wanton. The cable-gate was stretched across the private road about eight-tenths of a mile from the road's entrance. The road was known to be used by the public. Yet the gate, which was rust colored, was not readily visible and no

warning signs, other than a faded pink-colored rag used as a marker, were provided. Such conduct evinces an utter indifference to or conscious disregard for the safety of others."

*Id*. at 1317 n 11; *see also Middleton v. Reynolds Metals Co.*, 963 F2d 881, 884 (6th Cir 1992) (reversing summary judgment for landowner in claim by injured motorcyclist because "a jury could find that in erecting the thin steel cable over a ditch at a height of 18 inches without identifying markers, the defendant in the instant case acted wantonly or recklessly").

On the same reasoning, a jury question existed on whether Mountain View's conduct was wanton in this case. A jury could find that (1) Mountain View knew of the public use of the graveled road shortly before the cable gate; (2) the cable gate was not visible to road users and was dangerous because of its unobviousness; (3) Mountain View's agents regularly inspected and manipulated the cable gate on a day-to-day basis and knew of its dangerous condition; and (4) the danger was easy to correct with bright paint and warning devices. Plaintiff was entitled to jury consideration of whether Mountain View acted in reckless disregard of the consequences of its actions.

## III.   RE/MAX'S LIABILITY

A.   *Factual causation*

To begin with, in a negligence action, the plaintiff bears the burden to present evidence of factual causation by showing either that the defendant's conduct was a "but for" cause of the plaintiff's harm or, in the case of multiple and concurrent potential causes, that the defendant's conduct was a "substantial factor" in bringing about the harm. *Joshi v. Providence Health System*, 342 Or 152, 161-62, 149 P3d 1164 (2006); *see also Magnuson v. Toth Corp.*, 221 Or App 262, 266, 190 P3d 423, *rev den*, 345 Or 415 (2008) (citing *Joshi*). The particular circumstances of the case dictate which test is most appropriate.

The "but for" rule of causation is used in the majority of cases and may be stated as follows: " 'The defendant's conduct is a cause of the event if the event would not have

occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it.' " *Joshi*, 342 Or at 161 (quoting W. Page Keeton, *Prosser and Keeton on The Law of Torts* § 41, 266 (5th ed 1984)). Under the "but for" test, "a plaintiff must demonstrate that the defendant's negligence more likely than not caused the plaintiff's harm." *Id.* at 162. Or, in other words,

> " 'the causal connection between [the] defendant's acts or omissions and the plaintiff's injuries must not be left to surmise or conjecture. The proof of the material issue must have the quality of *reasonable probability*, and a mere possibility * * * is not sufficient.' "

*Id.* at 159 (quoting *Sims v. Dixon*, 224 Or 45, 48, 355 P2d 478 (1960)) (emphasis in *Joshi*).

By comparison, the substantial factor test for causation is best suited to the following situations in which the "but for" rule has proved troublesome: (1) "where 'two causes concur to bring about an event, and either one of them, operating alone, would have been sufficient to cause the identical result' "; (2) " 'where a similar, but not identical result would have followed without the defendant's act' "; and (3) " 'where one defendant has made a clearly proved but quite insignificant contribution to the result, as where he throws a lighted match into a forest fire.' " *Id.* at 161 (quoting Keeton, *Prosser and Keeton on Torts* at 267-68). In those situations, the " 'defendant's conduct is a cause of the event if it was a material element and a substantial factor in bringing it about.' " *Id.* (quoting Keeton, *Prosser and Keeton on Torts* at 267). "Whether any particular cause, or any individual actor's conduct, is sufficiently 'substantial' to warrant the imposition of liability depends, properly, on a consideration of the whole." *Lyons v. Walsh & Sons Trucking Co., Ltd.*, 183 Or App 76, 84, 51 P3d 625 (2002), *aff'd*, 337 Or 319, 96 P3d 1215 (2004).

In this case, there are multiple potential causes of plaintiff's injuries, including conduct by Re/Max, Mountain View, and plaintiff. I need not determine which causal test is most appropriate in this case, however, because plaintiff has raised genuine questions of material fact under both causation standards.

The majority concludes that "[t]here is no indication from this record that the presence of the Re/Max sign substantially influenced [plaintiff's] decision to travel up the access road or that, in the absence of Re/Max's conduct, the accident would not have occurred." 246 Or App at 42. Again, I disagree with the majority's factual conclusion. The evidence was that plaintiff began the biking excursion with the sole purpose of monitoring the mechanical condition of Jerid's motorcycle. On the way home, plaintiff stopped and looked at the Re/Max sign at the bottom of the access road. Plaintiff testified at his deposition, "I said, well, might as well go up there and see where there's properties for sale. I'm thinking it's in the vicinity of the same place, but I wasn't sure." Plaintiff then directed Jerid to proceed up the access road.

That evidence supports the conclusion, under the "but for" test, that a juror could reasonably infer that, more likely than not, plaintiff would not have turned onto the access road in the first place had he not seen the Re/Max directional sign on Indian Creek Road. That evidence also supports the conclusion, under the "substantial factor" test, that a juror could determine that Re/Max's conduct was a material element and a substantial factor that contributed to plaintiff's injuries. Given the totality of the evidence, I cannot say, as a matter of law, that Re/Max's conduct was not a "cause-in-fact" of plaintiff's injuries.

## B.  *Foreseeability of the risk*

In *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987), the Supreme Court observed the circumstances under which a party is legally responsible for harm factually caused by its conduct:

"[U]nless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff."

Put another way, a claim for common-law negligence includes "a foreseeable risk of harm to the plaintiff and conduct by the defendant that is unreasonable in light of that risk." *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 340, 83 P3d 322 (2004) (citing *Solberg v. Johnson*, 306 Or 484, 490, 760 P2d 867 (1988)). Even if the parties invoke a particular relationship to establish the existence of a duty of care on the part of the defendant, the scope of that particular duty nonetheless may be limited to harms to the plaintiff that were reasonably foreseeable. *Id.* at 341.

In this case, plaintiff's claim against Re/Max alleged negligence based on Re/Max's conduct in posting a directional sign and then failing to remove it when the second sign at the Kinyon property was removed, failing to warn the public of the cable at a time when Re/Max knew, or should have known, of the cable's existence, and failing to adequately inspect the roadway. "Whether negligence involves the commission of a negligent act or the taking of no action when the lack of action creates a foreseeable unreasonable risk of harm, the analysis [is] the same." *Fuhrer v. Gearhart By The Sea, Inc.*, 306 Or 434, 438, 760 P2d 874 (1988). Negligence based on a failure to act or to warn is therefore analyzed the same as negligence based on affirmative actions—by inquiring into foreseeability and unreasonable conduct. *Id.*

To the extent that plaintiff's negligence action against Re/Max is based on allegations of failure to warn, I note the particular relevance of the Supreme Court's analysis in *Fuhrer* to this case. In a failure to warn case, "the risk of harm created is exposure to a danger known to the defendant" or, in other words, "[t]he risk in a failure-to-warn case is not the hazard itself, but the chance that someone predictably will be exposed to danger * * * if no warning is made." *Id.*

> "A defendant may be liable if the defendant can reasonably foresee that there is an unreasonable risk of harm, a reasonable person in the defendant's position would warn of the risk, the defendant has a reasonable chance to warn of the risk, the defendant does not warn of the risk, and the plaintiff is injured as a result of the failure to warn."

*Id.* at 438-39.

In determining whether a risk of harm is foreseeable, the court observed in *Lasley v. Combined Transport, Inc.*, 234 Or App 11, 16, 227 P3d 1200, *adh'd to on recons*, 236 Or App 1, 237 P3d 859 (2010) (*Lasley I*), *aff'd*, 351 Or 1, 261 P3d 1215 (2011) (*Lasley II*) (citing *Buchler v. Oregon Corrections Div.*, 316 Or 499, 509, 853 P2d 798 (1993)), that "[f]oreseeability ordinarily presents questions of fact; however, where no reasonable juror could find that the kind of harm that befell the plaintiff was the foreseeable result of the defendant's negligent act, the harm is unforeseeable as a matter of law." In *Lasley I*, we surveyed several Supreme Court cases in which the plaintiff's injury was unforeseeable as a matter of law:

> "In *Hawkins v. Conklin*, 307 Or 262, 768 P2d 66 (1988), the court held that a tavern owner was not liable for injuries caused by a violent patron, because the owner had no knowledge or reason to know of the patron's violent tendencies when she served him alcohol.
>
> "In *Buchler*, a prisoner escaped from custody when the prisoner's work crew supervisor negligently left the keys in the ignition of a transport van. The prisoner then stole a gun from his mother's house 50 miles away and shot the plaintiff with it. The court held that the plaintiff's injury was not foreseeable because the prisoner did not have a history of violence. 316 Or at 502.
>
> "In *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 83 P3d 322 (2004), an accounting firm negligently completed an audit of the plaintiff's tax returns, knowing that the plaintiff planned to make a public securities offering. As a result of the defendant's negligence, the securities offer was delayed by about six weeks. In that time period, the market declined significantly, and the price at which the plaintiff could offer its shares was measurably lower. *Id.* at 333. The court held that the decline in the market, not the defendant's negligence, was the 'harm-producing force.' *Id.* at 345. Accordingly, the court held that the defendant was not liable as a matter of law. *Id.* at 347."

234 Or App at 16-17. We also noted in *Lasley I*, however, that the Supreme Court recently cautioned against relying on either *Buchler* or *Oregon Steel Mills, Inc.*, for the general proposition that every subsequent negligent act is an "intervening harm-producing force" that will immunize a prior

negligent actor from liability; instead, the Supreme Court reiterated that those cases turned on their specific facts. *Id.* at 17 (citing *Bailey v. Lewis Farm, Inc.*, 343 Or 276, 289-90, 171 P3d 336 (2007)).

Accordingly, in *Lasley I*, where the court reviewed the denial of the defendant trucking company's motion for directed verdict, we concluded first that "[a] jury reasonably could find that it was foreseeable that a traffic jam would result from a spill of [12,000 pounds of glass by the trucking company] on a major interstate highway" and that "a reasonable juror could find that [the] decedent's injuries and death [that occurred following a rear-end collision by a drunk driver at the back of the traffic jam] were foreseeable in these circumstances." *Id.* at 18. We further concluded that, "[c]onsidering the evidence that rear-end collisions are common in traffic jams and distracted drivers are common on the roadways, a reasonable juror could find that, in these circumstances, [the drunk driver's] actions were not the kind of intervening harm-producing force that would sever the causal link between the glass spill and the harm that befell [the] decedent." *Id.* at 19. Thus, we held that the trial court did not err in denying the trucking company's motion for directed verdict. *Id.* The Supreme Court's decision in *Lasley II* did not disturb those conclusions.

Here, plaintiff submitted evidence that Croslow, the Re/Max listing agent, initially saw the cable stretched across the access road when he first toured the Kinyon property with the owner and, further, that Croslow had seen the cable on several other occasions. In that regard, this case is unlike *Hawkins* or *Buchler*, where the defendants were unaware of the risks to which their conduct exposed the plaintiffs; rather, there is evidence that Re/Max knew, or had reason to know, of the cable near the Kinyon property. Thus, it was foreseeable that persons invited up the access road by Re/Max would be exposed to a known and dangerous condition—specifically, the cable.

Moreover, I cannot say that, as matter of law, it was unforeseeable that a person interested in viewing property for sale would be distracted while traveling on the road by

looking for the advertised property. Given those observations, the actions of plaintiff (driving while his eyes wandered, while looking back at Jerid, and while forgetting about the cable) were not the kind of intervening harm-producing force that would immunize Re/Max from responsibility for its own actions. A reasonable juror could find that, under the circumstances, colliding with the cable was a foreseeable risk of harm to which Re/Max's conduct exposed plaintiff.

## C.  *Unreasonableness of the conduct*

In determining whether an action or a failure to act is reasonable in the face of a foreseeable risk, a factfinder is to consider "the likelihood of harm, the severity of the possible harm, the 'cost' of action that would prevent harm, and the defendant's position, including the defendant's relationship with the plaintiff." *Fuhrer*, 306 Or at 439 (footnote omitted). Notably, however, the Supreme Court has recognized that, "[e]ven if there is no relationship between the parties, if the risk is great, either in likelihood or magnitude, and the cost is minimal, the reasonableness of the action should be determined by the factfinder." *Id.*

As demonstrated by the serious injuries that plaintiff sustained in this case, the cable presented an extremely hazardous condition to motorists on the access road. Further, nothing in the record suggests that the cost to Re/Max of preventing plaintiff's injuries, by either removing its invitation to use the access road or diverting any invited traveler from encountering the known and dangerous condition, would have been other than minimal. Given the circumstances, I conclude that the reasonableness of Re/Max's conduct should be determined by a factfinder.

To be clear, I do not suggest that Re/Max should be liable for plaintiff's injuries. As was recognized in *Fazzolari*,

"[t]he role of the court is what it ordinarily is in cases involving the evaluation of particular situations under broad and imprecise standards: to determine whether upon the facts alleged or the evidence presented no reasonable factfinder could decide one or more elements of liability for one or the other party. To quote *Stewart v. Jefferson Plywood Co.*[, 255 Or 603, 607, 469 P2d 783 (1970)]:

" 'The jury is given a wide leeway in deciding whether the conduct in question falls above or below the standard of reasonable conduct deemed to have been set by the community. The court intervenes only when it can say that the actor's conduct clearly meets the standard or clearly falls below it.' "

303 Or at 17-18. That said, I only conclude that, under the circumstances, plaintiff has brought forth sufficient evidence to create a genuine issue of material fact regarding whether his injuries were the foreseeable result of unreasonable conduct by Re/Max. Thus, the court should not affirm, as right for the wrong reason, the trial court's grant of summary judgment in Re/Max's favor.

## IV. COMPARATIVE FAULT

In light of the foregoing conclusions, I turn, at last, to the issue raised by plaintiff on appeal—that is, whether, under the circumstances, the apportionment of fault between the parties is an issue of fact for a jury to decide. Under ORS 31.600, only if the fault, if any, attributable to plaintiff is greater than the combined fault, if any, of defendants will plaintiff's own negligence bar his recovery. Although defendants essentially urge us to determine, as a matter of law, that plaintiff was both negligent and more than 50 percent at fault for his own injuries, defendants cite no case law in which we or the Supreme Court have made such determinations as a matter of law, nor has my research disclosed any such precedent.

Rather, in *Resser v. Boise-Cascade Corporation*, 284 Or 385, 390, 587 P2d 80 (1978), the Supreme Court reviewed the denial of the defendants' motion for directed verdict and explained:

"[T]he mere fact that defendants may have been negligent does not by itself justify the trial court in submitting the case to the jury. Under ORS 18.470 [the predecessor statute to ORS 31.600], it must appear that defendants' negligence was equal to or exceeded any negligence attributable to plaintiff. It is clear in the present case that plaintiff was not entirely free from negligence, and the jury so found. Nevertheless, in light of the evidence reviewed above, we believe reasonable minds could differ over the relative fault of the

parties, and we cannot say that 'it is manifest as a matter of law' that plaintiff's negligence exceeded defendants'. *Jordan v. Coos-Curry Elec. Coop*[, 267 Or 164, 165, 515 P2d 913, *on reh'g*, 516 P2d 472 (1973)]."

(Footnote omitted.)

We relied on *Jordan* and *Resser* in *Fitch v. Adler*, 51 Or App 845, 851-52, 627 P2d 36 (1981), where we too rejected a contention by the defendants that the plaintiff's negligence exceeded that of the defendants as a matter of law, thus barring her recovery and supporting a directed verdict in the defendants' favor. We held that, "[e]ven if we could say that plaintiff was negligent as a matter of law in this comparative negligence case, reasonable minds could differ on the degree of her negligence vis-a-vis defendants." *Id*. Accordingly, we concluded that the trial court erred in granting the defendants' motion for directed verdict. *Id*.

To the extent that those cases suggest that, under the appropriate set of facts, the issue of comparative fault may be properly removed from the province of the jury, they do not aid defendants in this case. Assuming that a reasonable juror could conclude that plaintiff was negligent in operating his motorcycle, I cannot say that, on the facts viewed in the light most favorable to plaintiff, "it is manifest as a matter of law" that plaintiff's negligence exceeded the negligence potentially attributable to defendants. As observed by the dissent in *Bosiljevac v. Ready Mixed Concrete Co.*, 182 Neb 199, 205, 153 NW2d 864, 868 (1967) (McCown and Smith, JJ., dissenting):

"It should also be noted that a traveler on a highway need not keep his eyes constantly fixed on the road or path of the highway to look for defects which should not exist, nor is he required to exercise such extreme vigilance as in all events to see defects or obstructions in the road ahead such as a cable stretched across the road."

This is not a case of extremes where, for example, it is readily apparent that the plaintiff's own conduct is highly unreasonable in light of a significantly foreseeable risk and where the defendant's conduct is only marginally unreasonable given a barely foreseeable dangerous condition. For that

reason, I would conclude that the trial court erred in apportioning fault among the parties as a matter of law and, as a result, erred in granting summary judgment in favor of defendants.

For all of the above reasons, I dissent from the majority opinion.